**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **NIPPON OIL EXPLORATION U.S.A. LIMITED** | **CIVIL ACTION** |
| **VERSUS** | **NO: 10-2850** |
| **MURPHY EXPLORATION & PRODUCTION COMPANY - USA** | **SECTION: "S" (3)** |

## ORDER AND REASONS

**IT IS HEREBY ORDERED** that Nippon Oil Exploration U.S.A. Limited's Motion for

Partial Summary Judgment (Doc. #10) is **GRANTED.**

**IT IS FURTHER ORDERED** that Murphy Exploration & Production Company -

USA's Motion for Summary Judgment (Doc. #11) is **DENIED**.

## BACKGROUND

Plaintiff, Nippon Oil Exploration U.S.A. Limited, is the current operator of wells located on

an oil and gas lease bearing serial number OCS-G 2551, granted by the United States of America

covering all of Block 537, West Cameron Area, South Addition, located on the Outer Continental

Shelf, off the coast of Louisiana.  Nippon brought this action against its ancestor in title, Murphy

Exploration & Production Company - USA, as a party to the Joint Operating Agreement with other

oil companies, to recover Murphy's prorata share of costs and expenses associated with the plugging and abandonment of certain wells located on the subject lease and the decommissioning of a fixed platform.

On March 1, 1974, Murphy entered into a Joint Operating Agreement for the oil and gas lease at issue.  On May 29, 1997, Pennzoil Exploration and Production Company, the operator of oil and gas production activities in the area covered by the lease, proposed that the "No. 3 well be abandoned, sidetracked and drilled and completed."  Murphy and CNG Production Company, another oil company that owned an interest in the lease, did not approve the proposal.  On June 11, 1997, Pennzoil afforded them a second opportunity to participate in the operation, and requested that they forward the assignment required under Paragraph 6 of Section VI of the Joint Operating Agreement if they chose not to participate in this "lease saving operation."

Paragraph 6 of Section VI of the Joint Operating Agreement provided:

> If it becomes necessary to drill a well on the Joint Lease in order to maintain said lease or a portion thereof in full force and effect, a non-participating party as to such well shall assign to the participating parties all of its right, title and interest in and to such Joint Lease or such portion thereof, <u>but such assignor shall not be relieved of any accrued obligations as to such Joint Lease or such portion thereof prior to such assignment</u>.

(Emphasis added).

On January 8, 1998, Murphy and Pennzoil executed an assignment whereby Murphy assigned all of its rights, title, and interests in the lease to Pennzoil.  The assignment had an effective date of June 12, 1997, and provided in pertinent part that:

> From and after the effective date of this Assignment, Assignee shall be liable for and shall assume all obligations and perform all duties <u>both of which result after the effective date and that result from the ownership of the rights conveyed hereby or imposed by any governmental authority asserting jurisdiction over the assigned acreage</u>.

(Emphasis added).

On July 31, 2008, Nippon acquired a 50% ownership interest in the lease from Pennzoil, and became the operator.  On March 15, 2009, Nippon informed Murphy by letter that it planned to plug and abandon the wells on the West Cameron 537 Platform, and requested that Murphy approve the expenditure and pay its share.  Murphy declined, contending that pursuant to the Assignment, Pennzoil, and its successors in interest, assumed any and all obligations "resulting from ownership." After a second request for approval and payment was declined, Nippon filed this suit.

The parties have filed cross motions for summary judgment regarding Murphy's obligation to pay its share of the costs and expenses associated with plugging and abandoning the wells and decommissioning the platform.  Nippon argues that pursuant to the clear terms of the Joint Operating Agreement and the Assignment, Murphy retained its obligation to pay its portion of the plug and

abandon operations and decommissioning operations which both accrued prior to the assignment

to Pennzoil, and resulted from the ownership of the rights.[1]

Murphy argues that it transferred its rights, title, and interest in the lease to Pennzoil pursuant

to Paragraph 1 of Section XXI of the Joint Operating Agreement, which provides:

> If a party hereto desires to withdraw from the Joint Lease, such party
> shall give notice of its intentions to the other parties hereto and offer
> to convey, by a recordable instrument, all of its interest in the Joint
> Lease and the property and equipment owned hereunder.  If the other
> parties desire to acquire said interest and to assume the obligations of
> the assigning party under the Joint Lease and this Operating
> Agreement, then the party desiring to withdraw shall deliver to said
> parties an assignment as above provided.  If the other parties hereto
> do not desire to accept such an assignment, the party desiring to
> withdraw may withdraw by paying to the other parties its prorate
> share of the estimate cost of plugging and abandoning all wells
> removing all platforms, structures or other equipment on the Joint

---

[1]  Decommissioning obligations, such as plug and abandon operations, accrue when you:

> (a)  Drill a well;
>
> (b) Install a platform, pipeline, or other facility;
>
> (c)  Create an obstruction to other users of the OCS;
>
> (d) Are or become a lessee or the owner of operating rights of a lease on
> which there is a well that has not been permanently plugged according to
> this subpart, a platform, a lease term pipeline, or other facility, or an
> obstruction;
>
> (e) Are or become the holder of a pipeline right-of-way on which there is
> a pipeline, platform, or other facility, or an obstruction; or
>
> (f) Re-enter a well that was previously plugged according to this subpart.

30 C.F.R. § 250.1702.

It is undisputed that the decommissioning obligations at issue accrued when Murphy owned an interest
in the lease.

> Lease, less any estimated salvage value as determined by the non-withdrawing parties, but the <u>withdrawing party shall remain liable for any costs, expenses or damages theretofore accrued or arising out of any event occurring prior to such party's withdrawal.</u>

(Emphasis added).

Murphy contends that the plain language of the Assignment supports its argument that it withdrew from the lease pursuant to this paragraph, and that it did not retain any obligations that accrued before its withdrawal.   Murphy parses the language of the Assignment and explains Murphy's ineterpretion as follows:

> (1)   **"From and after the effective date of this Assignment . . ."**
>
> This phrase indicates that Nippon did not assume the obligations contained in the Assignment until after the Assignment's effective date – June 1, 1997.  This phrase has no bearing whatsoever on *which* obligations Nippon was assuming.  It simply indicates *when* Nippon became liable for the obligations it was assuming.
>
> (2)   **". . . Assignee shall be liable for and shall assume all obligations and perform all duties both of which . . ."**
>
> This phrase, particularly the word "both," indicates that Nippon was assuming two classes of obligations.
>
> (3)    **". . . result after the effective date. . ."**
>
> This is the first class of obligations Nippon was assuming. This phrase indicates that Nippon was assuming the obligations which resulted, *i.e.*, became due, after the effective date of the assignment.
>
> (4)   **". . . and . . ."**
>
> This word is very important. It indicates that in addition to assuming the obligations which "result" after the effective

date of the assignment, Nippon was also assuming a second class of obligations.   Nippon's proposed interpretation ignores the effect of this word.

(5)   **". . . that result from the ownership of the rights conveyed hereby . . ."**

This is the second class of obligations Nippon was assuming. Since the "rights" obtained by Nippon was Murphy's 15% ownership in the lease, Nippon assumed the obligations which resulted from that ownership interest, *i.e.*, decommissioning the platform and plugging and abandoning the platform – regardless of when such obligations "resulted." Nippon's proposed interpretation ignores this entire class of obligations.

Murphy also argues that it would not have assigned its rights to future royalties without also assigning all of its obligations.

## ANALYSIS

### A.   Legal Standard

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Amburgey v. Corhart Refractories Corp., 936 F.2d 805, 809 (5th Cir. 1991); FED. R. CIV. PROC. 56(c).  If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial.  Celeotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986).  The non-movant cannot satisfy the summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.  Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*).  If the opposing party bears the burden of proof at trial, the moving

party does not have to submit evidentiary documents to properly support its motion, but need only

point out the absence of evidence supporting the essential elements of the opposing party's case.

Saunders v. Michelin Tire Corp., 942 F.2d 299, 301 (5th Cir. 1991).

**B.     Contract Interpretation**

Pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331, et seq.,

the court must apply the law of the state that is adjacent to the area of the Outer Continental Shelf

upon which the dispute arose, to the extent that it does not conflict with federal law and maritime

law does not apply of its own force. 43 U.S.C. § 1333(a)(1)-(2).  Because Block 537, West Cameron

Area, South Addition, is adjacent to Louisiana, Louisiana contract law is consistent with federal law,

and maritime law does not apply, Louisiana contract law applies to this matter.

The interpretation of an unambiguous contract is an issue of law for the court. Amoco Prod.

Co. v. Texas Meridian Resources Exploration Inc., 180 F.3d 664, 668 (5th Cir. 1999).  Interpreting

a contract is determining the common intent of the parties.  LA. CIV. CODE art. 2045. "Such intent

is to be determined in accordance with the plain, ordinary, and popular sense of the language used,

and by construing the entirety of the document on a practical, reasonable and fair basis." Amitech

U.S.A., Ltd. v. Nottingham Const. Co., - - - So.3d - - -, 2010 WL 4262277 (La. Ct. App. 2010).

Further, "[i]ntent is an issue of fact which is to be inferred from all of the surrounding

circumstances." Id. (citing Freeport-McMoRan, Inc. v. Transcontinental Gas Pipe Line Corp., 924

So.2d 207, 213 (La. Ct. App. 2005), writ denied, 925 So.2d 1256 (La. 2006)).

"When the words of a contract are clear and explicit and lead to no absurd consequences, no

further interpretation may be made in search of the parties' intent." LA. CIV. CODE art. 2046.  "In

addition, a contract provision is not ambiguous where only one of two competing interpretations is reasonable or merely because one party can create a dispute in hindsight." Texas E. Transmission Corp. v. Amerada Hess Corp., 145 F.3d 737, 741 (5th Cir. 1998).  Each provision of a contract must be interpreted in light of the other provisions "so that each is given the meaning suggested by the contract as a whole." LA. CIV. CODE art. 2050.  Further, "[a]s a general rule of contract law, separate documents may be incorporated into a contract by attachment or reference thereto." Russellville Steel Co., Inc. v. A & R Excavating, Inc., 624 So.2d 11, 13 (La. Ct. App. 1993) (citing Action Finance Corp. v. Nichols, 180 So.2d 81 (La. Ct. App. 1965)).

Murphy interprets the Assignment as assigning two classes of obligations: (1) those that arise after the effective date; and (2) those that arise from the ownership rights regardless of when they accrued.  This interpretation is unreasonable given the clear, unambiguous language of the Assignment.

Under the Assignment, Pennzoil assumed one class of obligations that met two conditions. The first condition is temporal.  That is, Pennzoil agreed to assume obligations that result after the effective date of the Assignment.  The second condition is the type of obligation Pennzoil agreed to assume, i.e., obligations resulting from the ownership rights conveyed by the Assignment or obligations that are imposed by a governmental authority.  Under this interpretation, Murphy would retain all obligations that accrued before the effective date of the Assignment whether they resulted from the ownership rights or were obligations that were imposed by a governmental authority. Therefore, Nippon is entitled to summary judgment that Murphy's assignment of its interest in Block 537, West Cameron Area, South Addition, did not relieve Murphy of its financial obligations

8

relating to the decommissioning and plugging and abandonment of Platform A and its appurtenances, and the A-1 and A-2 wells.

## CONCLUSION

**IT IS HEREBY ORDERED** that Nippon Oil Exploration U.S.A. Limited's Motion for Partial Summary Judgment (Doc. #10) is **GRANTED.**

**IT IS FURTHER ORDERED** that Murphy Exploration & Production Company - USA's Motion for Summary Judgment (Doc. #11) is **DENIED**.

New Orleans, Louisiana, this  25th  day of March, 2011.

_____
**MARY ANN VIAL LEMMON
UNITED STATES DISTRICT JUDGE**