**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **NIPPON OIL EXPLORATION U.S.A. LIMITED** | **CIVIL ACTION** |
| **VERSUS** | **NO: 10-2850** |
| **MURPHY EXPLORATION & PRODUCTION COMPANY - USA** | **SECTION: "S" (3)** |

**ORDER AND REASONS**

**IT IS HEREBY ORDERED** that Murphy Exploration & Production Company - USA's Motion for Summary Judgment on the Scope of Murphy's Liability to Nippon Oil Exploration U.S.A. Limited (Doc. #27) is **GRANTED** as to increases in the decommissioning expenses caused by storm damage that occurred after the assignment. The motion is **DENIED**, as to increases in the decommissioning expenses caused by the delay in decommissioning Platform A and plugging and abandoning the A-1 and A-2 wells.

**IT IS FURTHER ORDERED** that Murphy Exploration & Production Company - USA's Motion for Summary Judgment Regarding Prescription (Doc. #29) is **DENIED**.

**BACKGROUND**

Plaintiff, Nippon Oil Exploration U.S.A. Limited, is the current operator of wells located on an oil and gas lease bearing serial number OCS-G 2551, granted by the United States of America covering all of Block 537, West Cameron Area, South Addition, located on the Outer Continental Shelf, off the coast of Louisiana. Nippon brought this action against its ancestor in title, Murphy

Exploration & Production Company - USA, as a party to the Joint Operating Agreement with other oil companies, to recover Murphy's pro rata share of costs and expenses associated with the plugging and abandoning of certain wells located on the subject lease and the decommissioning of a fixed platform.

On March 1, 1974, Murphy entered into a Joint Operating Agreement for the oil and gas lease at issue. On May 29, 1997, Pennzoil Exploration and Production Company, the operator of oil and gas production activities in the area covered by the lease, proposed that the "No. 3 well be abandoned, sidetracked and drilled and completed." Murphy and CNG Production Company, another oil company that owned an interest in the lease, did not approve the proposal. On June 11, 1997, Pennzoil afforded them a second opportunity to participate in the operation, and requested that they forward the assignment required under Paragraph 6 of Section VI of the Joint Operating Agreement if they chose not to participate in this "lease saving operation."

Paragraph 6 of Section VI of the Joint Operating Agreement provided:

> If it becomes necessary to drill a well on the Joint Lease in order to maintain said lease or a portion thereof in full force and effect, a non-participating party as to such well shall assign to the participating parties all of its right, title and interest in and to such Joint Lease or such portion thereof, but such assignor shall not be relieved of any accrued obligations as to such Joint Lease or such portion thereof prior to such assignment.

(Emphasis added).

On January 8, 1998, Murphy and Pennzoil executed an assignment whereby Murphy assigned all of its rights, title, and interests in the lease to Pennzoil. The assignment had an effective date of June 12, 1997, and provided in pertinent part that:

> From and after the effective date of this Assignment, Assignee shall be liable for and shall assume all obligations and perform all duties both of which result after the effective date and that result from the ownership of the rights conveyed hereby or imposed by any governmental authority asserting jurisdiction over the assigned acreage.

(Emphasis added).

On July 31, 2008, Nippon acquired a 50% ownership interest in the lease from Pennzoil, and became the operator. On March 15, 2009, Nippon informed Murphy by letter that it planned to plug and abandon the wells on the West Cameron 537 Platform, and requested that Murphy approve the expenditure and pay its share. Murphy declined, contending that pursuant to the Assignment, Pennzoil, and its successors in interest, assumed any and all obligations "resulting from ownership." After a second request for approval and payment was declined, Nippon filed this suit.

The parties file cross motions for summary judgment regarding Murphy's obligation to pay its share of the costs and expenses associated with plugging and abandoning the wells and decommissioning the platform. The court granted Nippon's motion and denied Murphy's motion, holding that Murphy retained all obligations that accrued before the effective date of the Assignment, June 12, 1997, that resulted from the ownership rights or were imposed by a governmental authority. The court concluded that the assignment did not relieve Murphy of its financial obligations relating to the decommissioning and plugging and abandoning of Platform A and its appurtenances, and the A-1 and A-2 wells.

Murphy filed two additional motions for summary judgment. In the first motion, Murphy seeks a determination of the scope of its plug and abandon obligations, and seeks a determination

whether it is responsible for increased costs associated with a delay in performing the obligation, and the increased costs related to storm damage inflicted by hurricanes which occurred subsequent to the assignment. In the second motion, Murphy argues that Nippon's claims against it have prescribed.

## ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Amburgey v. Corhart Refractories Corp., 936 F.2d 805, 809 (5th Cir. 1991); FED. R. CIV. PROC. 56(c). If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial. Celeotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986). The non-movant cannot satisfy the summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*). If the opposing party bears the burden of proof at trial, the moving party does not have to submit evidentiary documents to properly support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case. Saunders v. Michelin Tire Corp., 942 F.2d 299, 301 (5th Cir. 1991).

### B. Contract Interpretation

Pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331, et seq., the court must apply the law of the state that is adjacent to the area of the Outer Continental Shelf

upon which the dispute arose, to the extent that it does not conflict with federal law and maritime law does not apply of its own force. 43 U.S.C. § 1333(a)(1)-(2). Because Block 537, West Cameron Area, South Addition, is adjacent to Louisiana, Louisiana contract law is consistent with federal law, and maritime law does not apply, Louisiana contract law applies to this matter.

### C. Murphy's Motion for Summary Judgment Regarding The Scope of Its Obligation to Nippon (Doc. #27)

Murphy seeks a ruling expressly limiting the scope of its obligation to Nippon for the decommissioning expenses to 15% of the costs associated with plugging and abandoning the A1 and A2 wells and decommissioning the platform as of the date of the assignment, June 12, 1997. Murphy argues that it is responsible only for the costs that would have accrued as of the date of the assignment if the decommissioning work were performed immediately because any additional costs resulted after the assignment. Murphy argues that the A1 and A2 wells were inactive as of the date of the assignment, and Nippon could have performed the plug and abandon operations at that time. Murphy argues that it should not be held liable for the increased costs caused by Nippon's delay in performing the work caused by intervening hurricanes.

Nippon argues that, pursuant to the definition in 30 C.F.R. § 250.1702, the full amount of the cost for the decommissioning operations accrued when Murphy became a lessee of the lease on which the wells sit, and that Murphy retained that obligation after the assignment. Nippon argues that Murphy could have executed an agreement with Pennzoil at the time of the assignment limiting Murphy's obligation to the amount it would have cost to perform the work in 1997, but it did not.

Under Louisiana law, "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. LA. CIV. CODE art. 2050. Contracts must be read in common-sense fashion, according to the common and usual meaning of the words, to lead to logical conclusions and give effect to the parties' obvious intentions. Lambert v. Maryland Cas. Co., 418 So.2d 553, 559 (La. 1982). "[A] contract must be viewed as a whole and, if possible, practical effect given to all its parts, according to each of the sense that results from the entire agreement so as to avoid neutralizing or ignoring any of them or treating them as surplusage." Id. "Some effect is to be given to every word or clause if possible for a court may not impute to the parties the use of language without meaning or effect." Id. at 560.

Murphy assigned its rights to Pennzoil pursuant to paragraph 6 of Section VI of the Joint Operating Agreement after Murphy refused to participate in a lease saving operation. Paragraph 6 of Section VI of the Joint Operating Agreement provides that Murphy was not relieved of its obligations that accrued prior to the assignment. Further, the assignment provides that the assignee, now Nippon, assumed obligations and would perform all duties that result after the effective date of the assignment, June 12, 1997, *and* that result from ownership rights or are imposed by governmental authority. Thus, Murphy retained all obligations that accrued before the effective date of the Assignment.

The Minerals Management Service ("MMS") regulations regarding offshore oil and gas wells are found in the Code of Federal Regulations at Title 30, Chapter II, Subchapter B. The MMS regulations govern parties' liabilities vis-à-vis the government, and do not give rise to private causes

of action. Fruge ex. Rel Fruge v. Parker Drilling Co., 337 F.3d 558, 563 (5th Cir. 2003). However, the regulations provide definitions regarding when obligations accrue.

Pursuant to 30 C.F.R. § 250.2701, "[l]essees and owners of operating rights are jointly and severally responsible for meeting decommissioning obligations . . . as the obligations accrue and until each obligation is met." A lessee accrues decommissioning obligations when it drills a well; installs a platform, pipeline, or other facility; or becomes a lessee or the owner of operating rights on a lease on which there is a well that has not been permanently plugged, a platform, a lease term pipeline, or other facility, or an obstruction; among other events. Id. at § 250.1702. Once an lessee accrues decommissioning obligations, it retains those obligations that accrued prior to the approval of the assignment notwithstanding the transfer. Id. at §§ 256.62(d), 256.64(a)(5). Further, a transferor remains jointly and severally liable for nonmonetary obligation under the lease and under the regulations, such as decommissioning, with each prior lessee and with each operating rights owner holding an interest at the time the obligation accrued. Id. at § 256.64(h)(1). All wells must be permanently plugged within one year after the lease terminates, and the MMS can order the plugging of a well if it poses a safety or environmental hazard or is not useful for lease operations and is not capable of production in paying quantities. Id. at §§ 250.1710, 250.1711.

The regulations provide that Murphy accrued decommissioning obligations when it participated in drilling the wells, installing the platform, and by becoming a lessee or the owner of operating rights on a lease on which there was a platform and a well that had not been permanently plugged, thereby retaining its proportionate share of those decommissioning obligations vis-à-vis the government notwithstanding the transfer of its leasehold rights, regardless of when the

decommissioning occurred. However, the regulations do not preclude agreements between the parties which allocate those obligations between themselves.

Under the assignment and paragraph 6 of Section VI of the Joint Operating Agreement, Murphy retained its obligations that accrued prior to the assignment, including the obligation to pay its proportionate share of decommissioning expenses for the wells and platforms that were placed on the lease prior to the effective date of the assignment. The Joint Operating Agreement provides that the operator shall charge the joint account of the working interest owners for:

> All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except to the extent that the damage or loss could have been avoided through the exercise of reasonable diligence on the part of the Operator.

By the terms of the Joint Operating Agreement and the assignment, it is clear that Murphy did not agree to embrace any obligations that were caused by hurricanes which occurred after the assignment. Murphy was not a working interest owner on the dates that the storms struck, therefore Murphy is not be liable for increases in those decommissioning costs caused by storm damage that occurred after the effective date of the assignment.

However, Murphy did not expressly limit its liability for decommissioning expenses for the wells and platforms that were in existence at the time of the assignment vis-à-vis the assignee to the amount that it would have cost to perform the work as of the effective date of the assignment, June 12, 1997, nor did Murphy expressly agree to pay actual decommissioning expenses whenever they occurred. Because the court does not have any evidence of the industry practice on the timing of decommissioning activities or the cause of the increased cost, it cannot determine the intent of the

parties regarding Murphy's responsibility for increases in decommissioning expenses that were not caused by storm damage.

Thus, Murphy's motion for summary judgment regarding the scope of its liability to Nippon is GRANTED, as to increases in the decommissioning expenses caused by storm damage that occurred after the assignment, and **DENIED**, as to increases in the decommissioning expenses caused by the delay in decommissioning Platform A and plugging and abandoning the A-1 and A-2 wells.

**D. Murphy's Motion for Summary Judgment Regarding Prescription (Doc. #29)**

Murphy argues that Nippon's breach of contract claim against it are prescribed pursuant to Louisiana Civil Code article 3499, which sets a ten year prescriptive period for breach of contract actions. Murphy argues that because the court held that it is obligated to pay its proportionate share of the decommissioning expenses that accrued before the effective date of the assignment, Nippon's cause of action against it accrued as of the date of the assignment, June 12, 1997. Murphy contends that Nippon's suit is untimely because it was filed 13 years later on August 27, 2010.

La. Civ. Code art. 3499 provides that the prescriptive period for a personal action, such as an action for breach of a contract, is ten years. The prescriptive period begins to run on the date that the cause of action arises. Corbello v. Iowa Prod., 850 So.2d 686, 705 (La. 2003).

Nippon's cause of action against Murphy arose in 2009 when Murphy breached the contract by refusing to pay its proportionate share of the decommissioning expenses. Nippon filed this suit regarding Murphy's breach of contract on August 27, 2010. Therefore, Nippon's breach of contract

claim against Murphy is not prescribed, and Murphy's motion for summary judgment regarding prescription is DENIED.

## CONCLUSION

**IT IS HEREBY ORDERED** that Murphy Exploration & Production Company - USA's Motion for Summary Judgment on the Scope of Murphy's Liability to Nippon Oil Exploration U.S.A. Limited (Doc. #27) is **GRANTED** as to increases in the decommissioning expenses caused by storm damage that occurred after the assignment. The motion is **DENIED**, as to increases in the decommissioning expenses caused by the delay in decommissioning Platform A and plugging and abandoning the A-1 and A-2 wells.

**IT IS FURTHER ORDERED** that Murphy Exploration & Production Company - USA's Motion for Summary Judgment Regarding Prescription (Doc. #29) is **DENIED**.

New Orleans, Louisiana, this 15th day of June, 2011.

**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**